# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

WILLIAM LEWIS HOUSTON,           )
      Petitioner,                )
                           )
v.                               )   No. 1:05-00013
                           )   Judge Haynes
ROBERT WALLER, Warden,           )
      Respondent.                )

## M E M O R A N D U M

Petitioner, William Lewis Houston, a state prisoner, filed this action under 28 U.S.C. § 2254, seeking the writ of habeas corpus to set aside his convictions on four counts of selling 0.5 grams or more of cocaine; two counts of selling 26 grams or more of cocaine; one count of facilitating the sale of 0.5 grams or more of cocaine; one count of selling counterfeit cocaine; and one count of aggravated assault. For these convictions, Petitioner received forty-six (46) years imprisonment.[1] Petitioner asserts claims for ineffective assistance of counsel and violation of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), based upon newly discovered evidence about the agent of the Tennessee Bureau of Investigation ("TBI") who investigated Petitioner and testified at Petitioner's trial. This agent was later indicted and convicted of tampering with evidence.

The Court appointed the Federal Public Defender to represent the Petitioner and an amended petition was filed. (Docket Entry No. 12). The Respondent filed his answer. (Docket Entry No. 17). The Court granted discovery (Docket Entry Nos. 21 and 24) and to expand the evidentiary record. The Court ordered the parties to file a joint pretrial order on their claims and defenses that was filed.

---

[1] Petitioner's original sentence was for seventy-two (72) years, that the Tennessee Court of Criminal Appeals reduced on direct appeal to forty-six (46) years. <u>State v. William Lewis Houston</u>, No. M19990-01430-CCA-R3-CD, 2000 WL 1793088 (Tenn.Crim.App. Dec. 7, 2000) (app. denied May 7, 2001).

(Docket Entry No. 34).

## I. Petitioner's Request for an Evidentiary Hearing

Petitioner requests an evidentiary hearing under 28 U.S.C. § 2254(e)(2)(A)(ii) on whether the TBI agent who was assigned to his case, committed the alleged drug crimes before Petitioner's trial; whether that agent disclosed his prior criminal conduct to the prosecutor during the Petitioner's proceeding and if so, whether the state prosecutor failed to disclose that information to Petitioner's defense counsel. Petitioner acknowledges that an evidentiary hearing is less compelling given the evidence submitted by Petitioner. (Docket Entry Nos. 19, 29, 31).

The Respondent contends that Petitioner is not entitled to an evidentiary hearing because he fails to meet the criteria for a hearing under 28 U.S.C. § 2254(e)(2). Respondent denies Petitioner's submission to the expand record resolves any factual issue.

In the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 110 Stat. 1214, Congress redefined the standards for conducting an evidentiary hearing in a habeas action in amending Section 2254 to provide as follows:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that - (A) the claims relies on - (I) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable fact-finder would have found the applicant guilty of the underlying offense.

28 U.S.C.§ 2254(e)(2).

In Williams v. Taylor, 529 U.S. 420 (2000), the Supreme Court stated that under Section 2254(e)(2), the initial focus on whether to conduct an evidentiary hearing, is whether the petitioner

2

exercised diligence in developing the state record and that diligence depends, in part, on whether the

petitioner or his counsel knew of the matters at issue and failed to pursue the matter in the state

courts:

> The question is not whether the facts could have been discovered but instead whether the prisoner was diligent in his efforts . . . <u>Diligence for purposes of the opening clause [of Section 2254(e)(2)] depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court;</u> it does not depend, as the Commonwealth would have it, upon whether those efforts could have been successful.
>
> *   *   *
>
> For state courts to have their rightful opportunity to adjudicate federal rights, <u>the prisoner must be diligent in developing the record and presenting, if possible, all claims of constitutional error. If the prisoner fails to do so, himself or herself contributing to the absence of a full and fair adjudication in state court, § 2254(e)(2) prohibits an evidentiary hearing to develop the relevant claims in federal court, unless the statute's other stringent requirements are met. Federal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings.</u>
>
> *   *   *
>
> Given knowledge of the report's existence and potential importance, a diligent attorney would have done more. Counsel's failure to investigate these references in anything but a cursory manner triggers the opening clause of § 2254(e)(2).

<u>Id.</u> at 435, 437 and 439-40 (emphasis added).

Independent of § 2254(e)(2), the Court possesses the inherent authority to set an evidentiary

hearing in a habeas action. <u>Harries v. Bell</u>, 417 F.3d 631, 635 (6th Cir. 2005); <u>Abdur'Rahman v.

Bell</u>, 226 F.3d 696, 705-06 (6th Cir. 2000). "[A] district court does have the inherent authority to

order an evidentiary hearing even if the factors requiring an evidentiary hearing are absent." <u>Abdur'

Rahman</u>, 226 F.3d at 705. Such hearings are set "to settle disputed issues of material fact." <u>Id.</u> at

706. This authority extends to where an inadequate record exists to decide a procedural default

controversy. <u>Alcorn v. Smith</u>, 781 F.2d 58, 60 (6th Cir. 1986).

3

Yet, "[i]f [the court] concludes that the habeas applicant was afforded a full and fair hearing by the state court resulting in reliable findings,[the court] may, and ordinarily should accept the facts as found in the hearing. But [the court] need not. In every case [the court] has the power, constrained only by [its] sound discretion, to receive evidence bearing upon the applicant's constitutional claim." Abdur'Rahman, 226 F.3d at 705 (quoting Townsend v. Sain, 372 U.S. 293, 318 (1963)). Even prior to AEDPA, a habeas petitioner had to show cause for his failure to develop the state record or that "a fundamental miscarriage of justice would result from failure to hold a federal evidentiary hearing," Keeney v. Tamayo-Reyes, 504 U.S. 1, 11-12 (1992). Moreover, the Supreme Court has stated that: "The state court is the most appropriate forum for resolution of factual issues in the first instance and creating incentives for the deferral of fact-finding to later federal court proceedings can only degrade the accuracy and efficiency of judicial proceedings." Id. at 9. Accord Byrd v. Collins, 209 F.3d 486, 516-17 (6th Cir. 2000) (quoting Keeney).

In a word, the distinction between § 2254(e)(2) and the Court's inherent authority to order an evidentiary hearing is whether "a petitioner is entitled to a hearing [under § 2254(e)(2)] . . . versus whether a district court has the inherent discretion to order a hearing [that] is still intact following Williams." Abdur'Rahman, 226 F.3d. at 706.

After a review of the documents submitted by the parties, the Court concluded that an evidentiary hearing was necessary to determine the time frame of the former TBI agent's drug use and tampering with evidence, the cited Brady materials.

## II. Review of the State Record

### A. Procedural History

Petitioner was convicted by a jury of four (4) counts of selling 0.5 grams or more of cocaine,

4

two (2) counts of selling 26 grams or more of cocaine, one count of facilitation of the sale of 0.5 grams or more of cocaine, one count of selling counterfeit cocaine, and one count of aggravated assault. The trial court sentenced Petitioner to an effective sentence of seventy-two (72) years' imprisonment. On direct appeal, the Tennessee Court of Criminal Appeals affirmed Petitioner's conviction, but reduced his sentence to forty-six (46) years based upon erroneous sentencing determinations. (Docket Entry No. 17, Answer, Addendum No. 4). The Tennessee Supreme Court denied Petitioner's application for permission to appeal. (Docket Entry No. 17, Answer, Addendum No. 5).

Petitioner then filed a petition for post-conviction relief that the state court denied after an evidentiary hearing on June 16, 2004. The Tennessee Court of Criminal Appeals affirmed the trial court's judgment. (Docket Entry No. 17). On October 4, 2004, the Tennessee Supreme Court denied Petitioner's application for permission to appeal. (Docket Entry No. 17, Answer, Attachment No. 10).

## B. State Courts' Findings of Fact[2]

### 1. Direct Appeal

On Petitioner's direct appeal, the Tennessee Court of Criminal Appeals summarized the facts underlying for his convictions:

> Between February and May of 1997, Ted Watkins, a paid undercover agent, conducted a series of drug transactions with the [petitioner]. During these transactions, the undercover agent was wired with an audio-taped transmission device which was monitored by Officer Dan Miller of the Giles County Sheriff's Department and Agent Pat Howell of the Tennessee Bureau of Investigation. At trial, the undercover agent, Miller and Howell testified about the underlying transaction

---

[2] State appellate court opinion findings can constitute factual findings under 28 U.S.C. § 2254(d). Sumner v. Mata, 449 U.S.539, 546-47 (1981).

5

for each indictment. The undercover agent testified that he coordinated the amount of cocaine that would be purchased during each transaction with Miller and Howell. The undercover agent further testified that telephone calls transpired between the defendant and him before each buy. These telephone conversations were taped by the undercover agent and admitted into evidence at trial. Miller and Howell also testified that, prior to each transaction, they met with the undercover agent at a previously arranged location where both the undercover agent and the agent's vehicle were searched. The undercover agent was then wired with the transmitter and given money for the purchase.

Indictment No. 8429 alleged that on February 19, 1997, the defendant sold 0.5 grams or more of cocaine. The state's proof revealed that on this date the undercover agent contacted the defendant, and the defendant set the time and place for the sale. When the undercover agent arrived at the defendant's residence, the defendant paged someone. When Andrew Gilbert arrived, defendant instructed the undercover agent to follow Gilbert to a trailer behind the defendant's house. Gilbert transferred 1.9 grams of cocaine to the agent for $110.

Indictment No. 8430 alleged that on February 21, 1997, the defendant sold 0.5 grams or more of cocaine. The state's proof revealed that on this date the undercover agent arrived at the defendant's residence, and the defendant told him to go to the back of a trailer next door where he would find the cocaine located under a rock. The defendant further stated that the undercover agent was to leave the money under the rock. The undercover agent followed the defendant's instructions and purchased 6.7 grams of cocaine for $325.

Indictment No. 8431 alleged that on March 7, 1997, the defendant sold 0.5 grams or more of cocaine. The state's proof revealed that on this date the undercover agent arrived at the defendant's residence and found the defendant and Gilbert arguing. The undercover agent learned that Gilbert had locked the keys in the trailer where the drugs were located. The defendant contacted a realtor to arrange for a new set of keys, and then asked the undercover agent to retrieve the keys from the realty company. When the undercover agent returned with the keys, he got 13.9 grams of cocaine from Gilbert for $675. The defendant was convicted of facilitation of this sale.

Indictment No. 8432 alleged that on March 13, 1997, the defendant sold 0.5 grams or more of cocaine. The state's proof revealed that on this date the undercover agent, after speaking with the defendant on the phone, went to defendant's residence where defendant again instructed the undercover agent to obtain the cocaine from under the rock where he was to leave the money. The undercover agent testified that the trailer was only a few steps from the defendant's house, and he secured 20.3 grams of cocaine and left $1,200 under the rock. He then returned to the defendant's house and had the defendant test the substance to insure that it was indeed cocaine.

6

Indictment No. 8433 alleged that on March 19, 1997, the defendant sold 0.5 grams or more of cocaine. The state's proof revealed that the undercover agent had placed a call to the defendant about making a buy, and the defendant informed him there was a "drought," meaning he was unable to obtain cocaine. Defendant stated he had called from "Houston to Indianapolis." However, the defendant later called the undercover agent and stated that he had obtained some cocaine. The undercover agent arrived at defendant's residence, and the two went into a trailer behind defendant's residence. The undercover agent weighed the cocaine, and the defendant counted the $1,220 given to him by the undercover agent. The amount of cocaine purchased was 17.2 grams.

Indictment No. 8434 alleged that on March 27, 1997, the defendant sold 26 grams or more of cocaine. The state's proof revealed that the undercover agent on this date was again initially informed that there was a "drought," but to "hold on," he would "put [him] down." Later that day, the defendant contacted the undercover agent and told him he had obtained the cocaine. When the undercover agent arrived, he and defendant again went to the trailer. "Another man" was also there. The undercover agent weighed the cocaine and discovered it was not the agreed upon amount. He told the defendant he could not purchase the cocaine because it was not what they agreed upon. Subsequently, the defendant offered to sell the cocaine for the price of $2,350, and the transaction was completed. The cocaine weighed 49.1 grams.

Indictment No. 8435 alleged that on April 17, 1997, the defendant sold 26 grams or more of cocaine. The state's proof revealed that on this occasion, after talking with defendant by phone, the undercover agent entered the defendant's residence and met an unidentified person. The defendant informed the undercover agent and the unidentified person to go outside by the house and conduct the transaction. The two went outside, and the undercover agent purchased 80.5 grams of cocaine. They then returned to the defendant's residence, where the unidentified man counted the money.

Indictment No. 8437 alleged that on May 1, 1997, the defendant sold counterfeit cocaine. The state's proof revealed that, after a phone conversation with the defendant concerning the proposed purchase of cocaine, the undercover agent went to the defendant's residence where he was met by Gilbert. The undercover agent inquired as to the whereabouts of the defendant. He was informed by Gilbert that he was in the residence with company, and that Gilbert would conduct the transaction. After securing what purported to be two ounces of cocaine for $2,950, the undercover agent went to the pre-arranged meeting place and turned the substance over to Agent Howell. Agent Howell immediately recognized that the substance was not cocaine.

Indictment No. 8436 alleged that on May 1, 1997, the defendant assaulted Agent Howell by the display of a deadly weapon. The state's proof revealed that, after the transaction described in Indictment No. 8437, Howell and the undercover agent discovered that the substance purported to be cocaine was counterfeit. Thereafter, the

7

> undercover agent along with Howell returned to the defendant's residence to demand the return of the money, at which point the defendant drew his weapon and pointed it at Howell. Howell then drew his pistol, and the defendant fled into the residence.

The jury found the defendant guilty as charged on each indictment with the exception of Indictment No. 8431, in which the jury convicted the defendant of the lesser charge of facilitation of the sale of 0.5 grams or more of cocaine.

State v. William Lewis Houston, No. M1999-01430-CCA-R3-CD, 2000 WL 1793088 **1-3 (Tenn. Crim. App. Dec. 7, 2000) (app. denied May 7, 2001).

## 2. Post-Conviction Appeal

On his post-conviction appeal, the Tennessee Court of Criminal Appeals denied Petitioner's ineffective assistance of counsel claims for his failure to demonstrate any prejudice from his counsel's alleged deficient performance.

> At the post-conviction hearing, Petitioner's trial counsel testified to the two instances of the trial judge entering the jury room. The trial judge also submitted an affidavit. His affidavit described one instance of entering the jury room where he substituted a page of instructions with the consent of counsel and that no deliberations occurred in his presence. Two jurors from Petitioner's trial also testified at the post-conviction hearing. One of the jurors testified that she did not even see the trial judge enter the jury room. The other juror recalled the trial judge coming in only once and that he made it clear that he could not discuss the trial, but he was making sure that everyone was comfortable and mentioned the possibility of visits with family members if the jury continued to be sequestered over Easter. In the transcript from Petitioner's trial, there is reference to one instance of the trial judge entering the jury room during deliberations, with the consent of both parties to substitute a page of the jury instructions.

> Appellate counsel testified at the post-conviction hearing that trial counsel's failure to object to the trial judge's communications with the jury made it impossible for him to rely on that issue on appeal. He went so far as to state that he believed that trial counsel's failure to object was ineffective assistance of counsel.

> *Ex parte* communications between the trial judge and the jury should be avoided even if counsel agrees, however, the Petitioner must also prove that trial counsel's failure to object prejudiced him.

> \* \* \*

8

After reviewing the evidence presented at the post-conviction hearing, including the testimony from the two jurors, we cannot conclude that the Petitioner has or could have shown any prejudice based on the communications between the trial judge and the jury or his trial counsel's failure to object to these communications. As stated above, one juror did not even recall the trial judge entering the jury room, and the other juror recalled an inquiry into the jury's comfort, including the possibility of visits with family members if the jury continued to be sequestered over Easter. We find no evidence of statements prejudicial to Petitioner. Petitioner has been unable to prove that the outcome of his trial would have been different had his trial counsel objected to the trial judge's communications with the jury.

Therefore, we affirm the trial court's decision that there is no basis for post-conviction relief based upon ineffective assistance of counsel.

Houston v. State, No. M2003-00304-CCA-R3-PC, 2004 WL 1372849, *2 (Tenn. Ct. Crim. App. 2004) (emphasis added).

The Tennessee appellate court also made findings on the Brady claim based upon Petitioner's "newly discovered evidence" claim about the TBI agent and found as follows:

Petitioner's final issue is that he should be granted a new trial based on newly-discovered evidence. The Tennessee Bureau of Investigation agent, Patrick Howell, was the agent in charge of Petitioner's case and handled the actions of a confidential informant. At the time of the post-conviction hearing, Agent Howell was under indictment for several counts of use or possession of cocaine, as well as, evidence tampering for incidents during 2001. Petitioner argues that the later indictments of Howell raise questions of his credibility at petitioner's trial.

Tennessee Code Annotated section 40-30-103 sets out the grounds for relief under a petition for post-conviction relief. Tennessee Code Annotated section 40-30-103 states, "[r]elief under this part shall be granted when the conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." The discovery of newly-discovered evidence as to a witness's credibility does not fall within these parameters. This Court has stated:

It has been long established that issues concerning the sufficiency of the evidence, the guilt or innocence of the accused, and the competency or credibility of witnesses, who testified at the trial are not cognizable in post-conviction proceedings.

Cole v. State, 798 S.W.2d 261 (Tenn.Crim.App.1990). Clearly, the discovery of new

9

evidence which calls into question the credibility of a witness at trial is not grounds for post-conviction relief.

Moreover, the indictments against Agent Howell center around allegations of criminal wrongdoing which occurred in 2001, four years after the incidents which form the bases of the petitioner's convictions, and two years after the petitioner's trial. To accept the petitioner's argument that such a situation requires a new trial would mean that any trial witness who subsequently engages in criminal conduct creates grounds for re-opening long final convictions. We do not believe this to be the law.

Id. at *5 (emphasis added and footnote deleted).

Although the Tennessee appellate court's findings reflect the state record, the Court will note Petitioner's citations to the State record on the Judge's contact with the jury. Here, the trial judge, Jim T. Hamilton, prepared a sworn affidavit stating "[t]hat after the conclusion of the trial and the jury had been charged, I realized that one sheet had to be replaced in the instructions and with consent of counsel, replaced the sheet in the jury room." (Docket Entry No. 19, Exhibit 1 thereto, Hamilton Affidavit). Two jurors who sat at Houston's trial testified at the post-conviction hearing. One juror testified that she did not see Judge Hamilton enter the jury room during deliberations. (Docket Entry No. 27, Addendum No. 7, Post-Conviction Transcript at p. 13). The second juror denied that Judge Hamilton entered the jury room during deliberations, id. at 102, and did not recall if the judge mentioned replacing a page of the instructions or read the new instructions to the jury. Id. at p. 103. Houston's trial counsel, Edward Hiland, testified that Judge Hamilton entered the jury room on two separate occasions:

Q:      And Mr. Hiland, during [the] trial, do you recall Judge Hamilton entering the jury room?

A:      Well, yes, I do, and I have just been made to realize that really there were two - - I remember two instances where he went into the jury room, one of which was put on the record. And another times is when we were standing out in the hallway, with the District Attorney and with the judge, and it had something to do with the meal, or some other problem that he just said he

10

> was going to go in an[d] talk to the jury about what they wanted to do. And he went in there. And I don't know what was said when he was in there.

Id. at 35.

There is proof that Judge Hamilton's "first trip" into the jury room occurred during deliberation on the Saturday before Easter Sunday. Id. at 37. Neither Hiland nor the prosecutor accompanied Judge Hamilton into the jury room. Id. at 36. Hiland had "no idea" what the judge said to the jury, but testified: "We discussed what the change or the addition to the jury charge should be, and he took it to the jury, himself. He did not call the jury back into the bench - - excuse me - - into the courtroom. He did not go back on the bench. He simply went in the jury room without us." Id. at p. 37. Hiland recalled that, at times prior to entering the jury room, Judge Hamilton remarked: "We can't keep this jury through Easter. None of us will be re-elected." Id. Hiland did not recall consenting to the judge's contact with the jury. Id. at 37. In fact, Hiland stated that he was "positive" that neither he nor Petitioner consented. Id. at 40. Any conversation the judge had with the jury was not transcribed, nor did the judge read the summary of the conversation into the record. Id. at 40. Hiland did not file written objections to the judge's actions. Id. at 38.

Hiland remembered that judge's second trip into the jury room "had something to do with the jury charge." Id. at 37. Again, the conversation with the jury was not transcribed verbatim by a court reporter. Id. at 41.

### c. Additional Findings of Fact on Petitioner's Brady Claim

From the TBI records, Howell's use of cocaine and his theft of cocaine from controlled buys began as early as August 1997 and from TBI Laboratory evidence in September 1997. Citing the demands of his work, Howell started using cocaine for his depression (Docket Entry No. 19, Attachment 5, Howell Sworn Statement at p. 2) and for "energy to keep . . . going" and "stay awake

11

and alert" and "concentrate during investigation." (Docket Entry No. 19, Attachment No. 4, SAC Roy Copeland's "Rough Draft Summation" at 1; and Docket Entry No. 19, Addendum 5, Howell Sworn Statement at p. 2). Howell acquired the cocaine for his own personal use by skimming from the cocaine he acquired in TBI undercover operations and also from the TBI laboratory reserves that he withdrew for TBI reverse sting operations as well as unreported buys from targets. (Docket Entry No. 19, Addendum No. 5, Howell Sworn Statement at p. 2).

According to this sworn statement, Howell skimmed cocaine from a buy on August 6, 1997. Id. at p. 1. On August 6th, TBI Special Agent Tom Brown stated the quantity of cocaine Howell delivered to him on that date was 13.3 grams less than the quantity Howell purchased from the target. (Respondent Collective Exhibit 1 at p. 18). TBI laboratory records reflect that Howell checked out kilograms of cocaine on September 4 and 15, 1997. (Docket Entry No. 19, Addendum No. 4, Copeland Memo at p. 19).

During the investigation of Petitioner, Howell supervised seven (7) controlled buys from Houston, but in the final buy, Howell took possession of the cocaine from the confidential informant after the buy for submission by him to the TBI Laboratory. (Docket Entry No. 27, Addendum No. 3, Trial Transcript at pp. 103, 185, 189, 196 and 600-601, 606, 607).

Petitioner telephoned the TBI that Howell was using cocaine and in a subsequent interview told a TBI agent that Hamilton was falsely claiming that he had been shorted in the six sales involving Houston. (Docket Entry No. 27, Addendum No. 7, Houston, Post-Conviction Transcript at pp. 130-31). Houston testified that an agent interviewed him at his residence for 40 to 45 minutes and took notes. Id. Howard Patterson, a TBI Agent acknowledged that he received Houston's information by telephone. Id. at pp. 150-51. Patterson forwarded his notes on Houston's complaint

12

to Jim Taylor, a TBI supervisor. Id. at pp. 151-53. According to Patterson, the interviewing agent was most likely SAC Jim Taylor. Id. at p. 152.

The TBI prepared a report (Docket Entry No. 27, Addendum No. 8, Exhibit 8), but the agent who prepared the report has since died. Thee TBI report reflects, in pertinent part:

Reverse Operation in 1997 and 2000

SA Howell indicated that he did take an amount of cocaine from a kilogram of cocaine he had checked out from the TBI Crime Laboratory in either 1997 or 1998. Laboratory records indicate that SA Howell checked out kilograms of cocaine for reverse operations on September 4, 1997; September 15, 1997; and on September 29, 2000.

\* \* \*

This investigation revealed that SA Howell had been a user of cocaine off and on for a period of time beginning in 1997 until present. He had supplied his cocaine habit by tampering with and stealing cocaine from purchases made while working as a law enforcement officer. He had also tampered and taken cocaine from drug evidence designated to be used in reverse operations. This theft and tampering with evidence occurred in several cases beginning in 1998 through [] September 15, 2001.

(Docket Entry No. 28, Addendum 8, Exhibit 8 thereto, T.B.I. 9/18/01 Memorandum (Rough Draft Summation at pp. 19-20) (emphasis added).

Petitioner notes Howell's various other statements about his cocaine use and other issues about Howell, but the Court does not need to resolve all of those matters. The Court finds that Howell used cocaine and tampered with State evidence, drugs, beginning in 1997 and continued to do so until 2001when he disclosed this conduct to the TBI. The Respondent did not call any state prosecutors on their awareness of Howell's drug use and evidence tampering.

In April 1999, Howell testified at Houston's trial and identified Houston as the principal source in the cocaine sales. (Docket Entry No. 27, Addendum No. 3, Howell, Trial Transcript at pp. 618, 621, 622, 624, 626). At trial, Howell's credibility was not tested on his drug use and skimming

13

of cocaine from the TBI laboratory and controlled buys.

### 4. Conclusions of Law

Petitioner's habeas claims are governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Lindh v. Murphy, 521 U.S. 320, 336 (1997). Under the AEDPA, federal courts may not grant habeas relief for claims adjudicated on their merits in a state court proceeding, unless that state court proceeding:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d).

In Williams v. Taylor, 529 U.S. 362, 413 (2000), the Supreme Court stated that a state court judgment is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court on a set of materially indistinguishable facts." In such instances, the Supreme Court held that a federal habeas court may grant a writ. Id. The Supreme Court interpreted the language "clearly established Federal law, as determined by the Supreme Court of the United States"as referring to "holdings as opposed to dicta" of its decisions at the time of the state court decision. Id. at 412. Moreover, the relevant analysis is "to apply a rule of law that was clearly established at the time the Petitioner's state court conviction became final." Id. at 390; accord, Joshua v. DeWitt, 341 F.3d 430, 436 (6th Cir. 2003). In Bell v. Cone, 535 U.S. 685, 693 (2002), the Court reiterated that AEDPA modified a federal court's role in reviewing state prisoner applications "in order to prevent federal habeas 'retrials' and to ensure that state court convictions

14

are given effect to the extent possible under the law."

Under the "unreasonable application" clause, the Supreme Court stated that a state court judgment results in an "unreasonable application" of clearly established federal law "if the state court correctly identifies the governing legal principle from [the Supreme Court's] decision but unreasonably applies [that principle] to the facts of the particular case." Id. at 694. The district court "must presume that all determinations of factual issues made by the state court are correct unless the defendant can rebut that presumption by clear and convincing evidence." Mitchell v. Mason, 325 F.3d 732, 737-38 (6th Cir. 2003) (citing 28 U.S.C. § 2254(e)(1)).

The Supreme Court explained that a state court's application of clearly established federal law must be "objectively unreasonable," Williams, 529 U.S. at 409, and a district court may not grant habeas relief "simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A state court's application of federal law is unreasonable and habeas relief may be granted if the "state court decision is so clearly incorrect that it would not be debatable among reasonable jurists." Herbert v. Billy, 160 F.3d 1131, 1135 (6th Cir. 1998) (quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir. 1996)).

### 1. Ineffective Assistance of Counsel Claims

Petitioner's ineffective assistance of counsel claims are two-fold: (1) Petitioner's trial and appellate counsel failed to object to the composition of Petitioner's jury, including jurors who sat on a jury in a drug trial against Petitioner's ex-wife, and in the jury pool in the trial against Petitioner's ex-wife; and (2) his counsel failed to object to the judge's entrance into the jury room to speak to the jury and to modify an instruction. Respondent asserts that Petitioner's claims about

15

his counsel's failure to object to certain jurors is barred by the post-conviction statute of limitations under Tenn. Code Ann. § 40-30-102(a) and violates the "one petition" limitation of Tenn. Code Ann. § 40-30-102(c). As a result, Respondent contends that this claim is procedurally defaulted. Engle v. Isaac, 456 U.S. 107, 128 (1982). Given the state courts' rulings on this claim, this Court will consider the merits of this claim, to the extent that the state courts did so. The other part of this claim is considered in the procedural default analysis, infra.

The Sixth Circuit summarized the Supreme Court's precedents on ineffective assistance of counsel claims:

> In United States v. Cronic, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), the Supreme Court held that an appeals court must reverse a criminal defendant's conviction "without any specific showing of prejudice to defendant when counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding." . . . In Williams, the Supreme Court confirmed the vitality of this "per se" approach, noting that while the Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), test for ineffective assistance of counsel, requiring proof of deficient performance and prejudice, provides guidance for resolving virtually all ineffective assistance of counsel claims, there are "a few situations in which prejudice may be presumed." Williams, 529 U.S. at 391(citing Strickland, 466 U.S. at 692, 104 S.Ct. 2052). We have recently applied the presumption-of-prejudice test to a claim of ineffective assistance of counsel. Olden, 224 F.3d at 568 (prejudice is presumed when counsel is absent during prosecution's presentation of evidence that implicates defendant because such absence occurred during "critical stage" of trial).

Mitchell v. Mason, 325 F.3d 732, 740 (6th Cir. 2003).

Within the first category are three types of cases warranting the presumption of prejudice arising from counsel's acts or omissions:

> The first is the complete denial of counsel, in which "the accused is denied the presence of counsel at 'a critical stage.'" Bell, 122 S.Ct. at 1851 (quoting Cronic, 466 U.S. at 659, 104 S.Ct. 2039). The second is when counsel "'entirely fails to subject the prosecution's case to meaningful adversarial testing.'" Id. (quoting Cronic, 466 U.S. at 659, 104 S.Ct. 2039). The third is when counsel is placed in circumstances in which competent counsel very likely could not render assistance.

16

Id. at 742.

In Murray v. Carrier, 477 U.S. 478, 486-88 (1986), the Supreme Court ruled that absent an error of constitutional magnitude, trial strategy decisions of counsel do not establish cause, unless the decision is of constitutional significance. (citing Engle v. Isaac, 456 U.S. 107, 133-34 (1982)). "[T]he mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute" prejudice. Id. at 486.

Based upon the state court findings, this Court concludes that there are not any facts to support a finding of prejudicial due to the contact between the state court judge and the jury. Thus, Petitioner's trial counsel lacked any proof of prejudice to object and even if Petitioner's counsel had objected, there are not any facts presented here to warrant any relief or to demonstrate prejudice on this claim. This Court concludes that the state courts' determinations on Petitioner's ineffective assistance of counsel claim based on these facts is not unreasonable.

## 2. The Brady Claims

Petitioner's Brady claim is that the State withheld evidence about TBI Agent Patrick Howell's drug abuse and criminal activity in violation of Petitioner's rights under Brady. Respondent contends that Petitioner's Brady claim is procedurally barred by Tennessee's post-conviction statute of limitations, waiver provisions and restrictions of successive state petitions. Tenn. Code Ann. §§40-30-102(a), 40-30-102(c), 40-30-106(g), and 40-30-117. Yet, as reflected earlier in this Memorandum, the state courts addressed the merits of this contention and even if defaulted, the suppressed evidence here is clearly material.

In Brady v. Maryland, 373 U.S. 83 (1963), the Supreme Court held that the government is required to turn over evidence in its possession that is both favorable to the accused and material to

17

guilt or punishment. "We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Id. at 87. Later, the Supreme Court restated the elements of a Brady violation. "There are three components of a true Brady violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." Strickler v. Greene, 527 U.S. 263, 281-82 (1999). Brady extends to impeachment evidence, United States v. Bagley, 473 U.S. 97, 107 (1985).

In Kyles v. Whitley, 514 U.S. 419 (1995), the Supreme Court reiterated that Brady materials require disclosure of exculpatory and impeachment evidence, without a request from the defendant.

> [In Bagley], the Court disavowed any difference between exculpatory and impeachment evidence for Brady purposes, and it abandoned the distinction between the second and third Agurs circumstances, i.e., the "specific-request" and "general- or no-request" situations. Bagley held that regardless of request, favorable evidence is material, and constitutional error results from its suppression by the government, "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."

Id. at 433 (quoting United States v. Bagley, 473 U.S. 667, 682, 685 (1985)).

The State court records reflect that the TBI did not know of this agent's drug problem until September 15, 2001, when the agent disclosed his drug problem to his fellow TBI agents. (Docket Entry No. 27, Addendum No. 8, Exhibit 8 thereto). Yet, Brady extends to exculpatory or impeachment information that is known by police officers assigned to the prosecution team. As the Supreme Court stated:

18

The State of Louisiana would prefer an even more lenient rule. It pleads that some of the favorable evidence in issue here was not disclosed even to the prosecutor until after trial, Brief for Respondent 25, 27, 30, 31, and it suggested below that it should not be held accountable under Bagley and Brady for evidence known only to police investigators and not to the prosecutor. [FN]

> [FN] The State's counsel retreated from this suggestion at oral argument, conceding that the State is "held to a disclosure standard based on what all State officers at the time knew." Tr. Of Oral Arg. 40.

To accommodate the State in this manner would, however, amount to a serious change of course from the Brady line of cases. In the State's favor it may be said that no one doubts that police investigators sometimes fail to inform a prosecutor of all they know. But neither is there any serious doubt that 'procedures and regulations can be established to carry [the prosecutor's] burden and to insure communication of all relevant information on each case to every lawyer who deals with it'.

Kyles, 514 U.S. at 438 (quoting Giglio v. United States, 405 U.S. 150, 154 (1972).

The Supreme Court reiterated in Strickler v. Greene, 527 U.S. 263, (1999) that " the [Brady] rule encompasses evidence 'known only to police investigators and not the prosecutor.' To comply with Brady, therefore, 'the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police.'" (quoting Kyles, 514 U.S. at 437, 438).

Kyles restated that Brady's underlying principles apply in three defined circumstances.

[T]hree situations in which a Brady claim might arise: first, where previously undisclosed evidence revealed that the prosecution introduced trial testimony that it knew or should have known was perjured, 427 U.S., at 103-104, 96 S.Ct., at 2397-2398; second, where the Government failed to accede to a defense request for disclosure of some specific kind of exculpatory evidence, id., at 104-107, 96 S.Ct., at 23989-2399; and third, where the Government failed to volunteer exculpatory evidence never requested, or requested only in a general way. The Court found a duty on the part of the Government even in this last situation, though only when suppression of the evidence would be "of sufficient significance to result in the denial of the defendant's right to a fair trial." Id., at 108, 96 S.Ct., at 2400.

514 U.S. at 433. (emphasis added). From a review of the state record, Petitioner's claim falls in the

19

third category as the TBI agent, the case agent and key state witness, "failed to volunteer" impeachment evidence about his drug use and tampering with evidence.

To warrant federal habeas relief on a Brady claim, the issue is "whether 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict based upon a . . . reasonable probability that the result of the trial would have been different if the suppressed documents had been disclosed to the defense.'" Strickler, 527 U.S. at 289, 290 (quoting Kyles, 514 U.S. at 434). The analysis is whether the TBI agent's drug use and tampering with evidence is material within the meaning of Brady:

> Four aspects of materiality under Bagley bear emphasis. Although the constitutional duty is triggered by the potential impact of favorable but undisclosed evidence, a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal (whether based on the presence of reasonable doubt or acceptance of an explanation for the crime that does not inculpate the defendant). ... The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial." Bagley, 473 U.S., at 678.

> The second aspect of Bagley materiality bearing emphasis here is that it is not a sufficiency of evidence test. A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict. The possibility of an acquittal on a criminal charge does not imply an insufficient evidentiary basis to convict. One does not show a Brady violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.

> Third, ... once a reviewing court applying Bagley has found constitutional error there is no need for further harmless-error review. Assuming, arguendo, that a harmless-error enquiry were to apply, a Bagley error could not be treated as harmless, since "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different," 473 U.S., at 682 (opinion of

20

Blackmun, J.).... In sum, once there has been Bagley error as claimed in this case, it cannot subsequently be found harmless under Brecht.

The fourth and final aspect of Bagley materiality to be stressed here is its definition in terms of suppressed evidence considered collectively, not item by item. As Justice Blackmun emphasized in the portion of his opinion written for the Court, 473 U.S., at 675, 105 S.Ct., at 3380 and n. 7. We have never held that the Constitution demands an open file policy (however such a policy might work out in practice), and the rule in Bagley (and, hence, in Brady ) requires less of the prosecution than the ABA Standards for Criminal Justice, which call generally for prosecutorial disclosures of any evidence tending to exculpate or mitigate. ...

While the definition of Bagley materiality in terms of the cumulative effect of suppression must accordingly be seen as leaving the government with a degree of discretion, it must also be understood as imposing a corresponding burden. On the one side, showing that the prosecution knew of an item of favorable evidence unknown to the defense does not amount to a Brady violation, without more. But the prosecution, which alone can know what is undisclosed, must be assigned the consequent responsibility to gauge the likely net effect of all such evidence and make disclosure when the point of "reasonable probability" is reached. This in turn means that the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police. But whether the prosecutor succeeds or fails in meeting this obligation (whether, that is, a failure to disclose is in good faith *438 or bad faith, see Brady, 373 U.S., at 87, 83 S.Ct., at 1196-1197), the prosecution's responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable.

Id. at 434-38 (emphasis added).

At the post-conviction hearing, Howell described his role in the Petitioner's prosecution as the "case agent". (Docket Entry No. 28, Addendum 8 at p. 160)Howell described a "case agent"'s duties: "There is always an agent generally who is in charge of working a specific case. It's his responsibility to organize the case, organize any actions that take place in that case, keep a case file, and prepare the case for prosecution." Id

Petitioner cites the following portions of the state trial record on the importance of the TBI agent's at Petitioner's trial:

As an agent from the T.B.I., Howell provided resources, expertise and credibility to

21

the investigation. Until he became involved, the Sheriff's Department had no direct or circumstantial evidence of Mr. Houston's involvement in drug dealing other than alleged purchase of one gram of cocaine by Watkins, a convicted criminal who may or may not have been searched by Miller prior to the buy. Howell provided support for the investigation, testifying that the T.B.I. had "numerous intelligence reports" on Mr. Houston and that the Bureau has investigated him in the past. (TR at 596-97). Moreover, as a practical matter, Howell provided the money for Watkins to purchase amounts of cocaine far in excess of what was otherwise possible. Also, Howell equipped Watkins with a "wire" and supervised the surveillance of Mr. Houston. Prior to his involvement, neither Bass nor Miller had any evidence of Watkins' activities when he was out of their eyesight and purporting to purchase drugs from Mr. Houston or others. Howell testified that the tapes of the conversations between Mr. Houston and Watkins, many of which were difficult to decipher, were transcribed by the T.B.I. and that he "tr[ied] to fill in gaps that transcriber missed or couldn't hear." (TR at 602-604). Finally, the involvement of the T.B.I. in a drug sting in a small rural community, by itself, sent a message to the jury that Bass was correct in suspecting that Mr. Houston "was and is the biggest drug dealer in Giles County." (TR at 590). Howell confirmed that Mr. Houston was a "good sized dealer." (TR at 610). Without Howell's testimony, the State would have been left to rely primarily upon the claims of Watkins, a drug user with criminal convictions who was paid as much as $3,200.00 for his participation in the case. (TR at 501-513).

(Docket Entry No. 12, Amended Petition at 29-30). Howell, the TBI agent at issue was referred to several times in the Tennessee appellate court's findings of fact on the Petitioner's convictions. Supra at pp 6-8.

In this Court's view, Howell was a key state witness. Howell's cocaine use and theft of drugs from the TBI laboratory during the time of the investigation of Petitioner and at the time of Petitioner's trial are clearly exculpatory evidence. As the TBI report reflects:

Reverse Operation in 1997 and 2000

SA Howell indicated that he did take an amount of cocaine from a kilogram of cocaine he had checked out from the TBI Crime Laboratory in either 1997 or 1998. Laboratory records indicate that SA Howell checked out kilograms of cocaine for reverse operations on September 4, 1997; September 15, 1997; and on September 29, 2000.

\* \* \*

22

> This investigation revealed that SA Howell had been a user of cocaine off and on for a period of time beginning in 1997 until present. He had supplied his cocaine habit by tampering with and stealing cocaine from purchases made while working as a law enforcement officer. He had also tampered and taken cocaine from drug evidence designated to be used in reverse operations. This theft and tampering with evidence occurred in several cases beginning in 1998 through [] September 15, 2001.

(Docket Entry No. 28, Addendum 8, Exhibit 8 thereto, T.B.I. 9/18/01 Memorandum (Rough Draft Summation at pp. 19-20) (emphasis added).

Under Brady such facts can be used to impeach his credibility. Howell was involved in the Petitioner's buys that gave rise to his trial. A key witness's use of cocaine impacts the witness's credibility and recollection of events. In that respect, the TBI agent's usage of cocaine at least during the period of Petitioner's trial is material impeachment evidence that could seriously affect issues as to amounts of cocaine actually purchased. This impeachment evidence leads this Court to have a lack of confidence in the verdict giving rise to Petitioner's conviction. Although the Tennessee appellate court found that the TBI agent's criminal charges did not arise until four years after the Petitioner's trial and the evidence tampering occurred two years after Petitioner's trial, the evidence in this Court is that the TBI agent's cocaine use and his tampering with evidence began in 1997 and 1998 that was prior to and during the same time period as the Petitioner's criminal investigation and trial. The State courts' findings on this issue are unreasonable because those courts lacked a complete review of the lead agent's activities. The timing of the agent's use of cocaine and tampering with evidence is the key, not the date of his conviction.

### III. Procedural Default

For completeness of the record, the second part of Petitioner's ineffective assistance of counsel claim is that his trial and appellate counsel failed to object to the composition of

23

Petitioner's jury, including jurors who sat on a jury in a drug trial against Petitioner's ex-wife, and in the jury pool in the trial against Petitioner's ex-wife. Respondent asserts that this claim is barred by the post-conviction statute of limitations under Tenn. Code Ann. § 40-30-102(a) and violates the "one petition" limitation of Tenn. Code Ann. § 40-30-102(c). As a result, Respondent contends that this claim is procedurally defaulted, citing Engle v. Isaac, 456 U.S. 107, 128 (1982).

### B. Conclusions of Law

The Supreme Court defined the "Procedural Default Doctrine" for federal habeas proceedings as barring federal habeas relief in the certain instances:

> [t]his Court will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment. This rule applies whether the state law ground is substantive or procedural. In the context of direct review of a state court judgment, the independent and adequate state ground doctrine is jurisdictional. Because this Court has no power to review a state law determination that is sufficient to support the judgment, resolution of any independent federal ground for the decision could not affect the judgment and would, therefore, be advisory.
>
> *     *     *
>
> . . . the doctrine applies also to bar federal habeas when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement. In these cases, the state judgment rests on an independent and adequate state procedural ground.

Coleman v. Thompson, 501 U.S. 722, 729-30 (1992) (emphasis added and citations omitted).

The rationale for this doctrine arises out of federal respect for federalism and maintaining comity with state courts. Id. at 730, 732. The Supreme Court further recognized that state

24

procedural rules also serve a legitimate state interest in finality of criminal convictions. <u>Francis v. Henderson</u>, 425 U.S. 536, 542 (1976) (quoting <u>Kaufman v. United States</u>, 394 U.S. 217, 228 (1969)). In <u>Murray v. Carrier</u>, 477 U.S. 478, 490-01(1986), the Supreme Court noted that state procedural rules channel the controversy to the state trial and appellate courts.

The parties do not dispute that the Tennessee appellate courts were not presented with this claim. (Docket Entry No. 34, Joint Pretrial Order at p. 4). Where the state courts have not found default, the court must consider whether the state courts would bar the contested claim, if this claim were presented to them. A district court cannot review a claim:

> if the petitioner failed to exhaust, state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred. In such a case there is a procedural default for purposes of federal habeas regardless of the decision of the last state court to which the petitioner actually presented his claim.

<u>Coleman v. Thompson</u>, 501 U.S. at 735 n.1 (citing <u>Harris v. Reed</u>, 489 U.S. 255, 269-270 (1989) (O'Conner, J., concurring). The Tenth Circuit refers to this as an "anticipatory procedural default," <u>Moore v. Scoemay</u>, 288 F.3d 1231, 1233 n.3 (10th Cir. 2002).

In the Sixth Circuit, the analysis under procedural default doctrine was set forth in the <u>Maupin v. Smith</u>, 785 F.2d 135, 138 (6th Cir. 1986):

> When a state argues that a habeas claim is precluded by the petitioner's failure to observe a state procedural rule, the federal court must go through a complicated analysis. First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule.

> \*   \*   \*

> Second, the court must decide whether the state courts actually enforced the state procedural sanction.

> \*   \*   \*

25

Third, the court must decide whether the state procedural forfeiture is an "adequate and independent" state ground on which the state can rely to foreclose review of a federal constitutional claim.... This question generally will involve an examination of the legitimate state interests behind the procedural rule in light of the federal interest in considering federal claims.

Maupin, 785 F.2d at 138 (citations omitted).

### 1. Noncompliance with Applicable State Rules

Under Maupin, the threshold issue is the existence of an applicable state law rule and the petitioner's noncompliance therewith. Here, Tenn Code Ann. § 40-30-102, the limitations period in the Tennessee Post-Conviction Act was amended in 1995 to provide a one year period of limitation and is now codified at Tenn. Code Ann. § 40-30-202. Petitioner's state court finding and state court opinions demonstrated Petitioner's non-compliance with this provision of Tennessee's Post-Conviction Act.

### 2. "Firmly Established" and "Regularly Followed" State Rules

To qualify for the procedural default rule, the cited state law must be "firmly established and regularly followed" at the time the claim arose. Ford v. Georgia, 498 U.S. 411, 423-24 (1991). As the Sixth Circuit explained, "[c]onsiderations of comity do not require a federal court to abstain from deciding a constitutional claim on grounds of procedural default where the state courts have not enforced a given state procedural rule." Rice v. Marshall, 816 F.2d 1126, 1129 (6th Cir. 1987).

As to the limitations period in § 40-30-102[3] that rule has been held to be strictly enforced with a narrow exception. Burford v. State, 845 S.W.2d 204, 209-10 (Tenn. 1992). In Hutchinson v. Bell, 303 F.3d 720 (6th Cir. 2002), the Sixth Circuit analyzed Tennessee's statute of limitations

---

[3]The limitations period in the Tennessee Post-Conviction Act was amended in 1995 to provide a one year period of limitation and is now codified at Tenn. Code Ann. § 40-30-202.

26

statute on post-conviction petitions and  Burford exception in a procedural default analysis   and

found the Tennessee limitations rule to constitute a firmly established and regularly followed state

law.  Id. at 738-739   Thus, the Court concludes that Tennessee's limitations statute is regularly

enforced.

### 3. Independent and Adequate State Rule

As to what is an independent and adequate state rule, the Supreme Court recognized the

following state interests as constituting adequate grounds for state procedural rules.

> The possible avoidance of an unnecessary trial or of a retrial, the difficulties of
> making factual determinations concerning grand juries long after the indictment has
> been handed down and the grand jury disbanded, and the potential disruption to the
> numerous convictions of finding a defect in a grand jury only after the jury has
> handed down indictments in many cases.

Coleman, 501 U.S. at 745-46.

Another  reason to support a finding of adequate state rules was articulated in        Francis,

wherein the Supreme Court enforced a state rule that promoted finality, noting a comparable federal

rule.

> Plainly the interest in finality is the same with regard to both federal and state
> prisoners.  ... There is no reason to ... give greater preclusive effects to procedural
> default by federal defendants than to similar defaults by state defendants.  To hold
> otherwise would reflect an anomalous and erroneous view of federal-state relations.

425 U.S. at 541-42.

As to types of procedural rules which have been found to be independent and adequate, in

Coleman, the Supreme Court upheld a procedural rule that bars consideration of a federal claim for

failure to meet state law requirements for timely appeals.   501 U.S. at 750-51.  "'No procedural

principle is more familiar to this court than that a constitutional right may be forfeited in criminal

as well as in civil cases by the failure to make timely assertions of the right before a tribunal having

27

jurisdiction to determine it.'" Id. at 751 (quoting Yakus v. United States, 321 U.S. 414, 444 (1944).

Accord Brown v. Allen, 344 U.S. 443, 485-86 (1953) (procedural default rule applied a state rule

that placed time limits on appellate rights). "No less respect should be given to state rules of

procedure." Id. (citing Francis, 425 U.S. at 541-42).

Based upon Hutchinson, the Court concludes that Tennessee's limitations period for post-

conviction petition is an independent and adequate state rule that promotes the timely presentation

of claims. Thus, Petitioner's second part of his ineffective assistance of counsel claim is defaulted.

### 4. The Cause and Prejudice Requirement

Once the respondent establishes procedural default, the burden shifts to the petitioner to show

cause for the procedural default and actual prejudice or that the failure to consider the claim will

result in a miscarriage of justice by the conviction of one who is actually innocent. Schlup v. Delo,

513 U.S. 298, 322 (1995). Cause for a procedural default must depend on some "objective factor

external to the defense" that interfered with the petitioner's efforts to comply with the procedural

rule. Coleman, 501 U.S. at 752-53.

Inadequate defense counsel can prove cause, but only if counsel's conduct violates Sixth

Amendment standards and counsel's inadequate conduct has been presented to the state courts.

Carrier, 477 U.S. 478, 488-89 (1986). The Supreme Court emphasized in    Coleman that mere

attorney error cannot be cause and cannot be attributable to the state. Coleman, 501 U.S. at 753-54

(emphasis added).

To serve as cause, the specific ineffective assistance of counsel claim, must itself not be

subject to procedural default absent a showing of a miscarriage of justice and/or a showing of cause

and prejudice for that claim. Edwards v. Carpenter, 529 U.S. 446, 448, 453 (2000) ("to hold, as we

do, that an ineffective-assistance-of-counsel claim asserted as cause for the procedural default of

another claim can itself be procedurally defaulted is not to say that procedural default may not itself

28

be excused, if the prisoner can satisfy the cause-and-prejudice standard with respect to that claim.")

Here, any omission of Petitioner's counsel in the state post-conviction proceedings is defaulted and cannot establish cause. This part of the Petitioner's ineffective assistance of counsel claim cannot be considered.

For the above stated reasons, the Court concludes that only Petitioner's <u>Brady</u> claim has merit and for that reason this petition should be granted.

An appropriate Order is filed herewith.

**ENTERED** this the 28th day of March, 2008.

WILLIAM J. HAYNES, JR.
United States District Judge